## No. 11,464.

### MICHAEL VANOSDEL, CURATOR, VS. JOHN A. HYCE.

.It is not established that the person interdicted in 1893, whose curator sues to set aside a deed of sale, was *non compos mentis* in 1879, at the date of the sale; nor is it established that he was at the time, because of the weakness of his mind, unable to give his consent intelligently as a vendor of his property.

Generally, an executed contract, fairly made with one who was apparently of sound mind and not known to be otherwise, and of which he had received the benefit, can not be avoided by his legal representative more than fourteen years after the date of the contract.

APPEAL from the Fifteenth District Court, parish of East Baton Rouge. *Buckner, J.*

*H. N. Sherbourne* and *T. A. Moore* Attorneys for Plaintiff and Appellant:

Although no sentence of interdiction may have been pronounced, yet it will be sufficient to vitiate a contract if it can be shown that insanity or imbecility of mind has been taken advantage of. Holland vs. Miller, 12 An. 624; C. C. 1780-2, 1788.

Contracts made with weak-minded persons will be closely scrutinized, and a presumption of fraud will arise from circumstances indicative of over-influence or any advantage improperly taken, which would not arise in a strong-minded person. Wharton & Stille Med. Jurisprudence, p. 10, Sec. 4; 1 Story Eq. Jurisprudence, 228; Chevallier vs. Whatley, 12 An. 651; 32 An 91, 170; 35 An. 441.

·Good faith is an essential to the acquisition of property by the prescription of ten years. Edwards vs. Bellard, 12 An. 362; Walling vs. Morefield, 33 An. 11, 74; Green vs. Moore, 44 An. 856; C. C. 3478.

'The prescription of three years does not apply to the rents and revenues of property claimed in the petitory action against a purchaser in bad faith. Walling vs. Morefield, 33 An. 1174.

·That a *fraudulent* act is in bad faith is self-evident.

A person knowing of defects of title is in bad faith and can not plead the prescription of ten years. 44 An. 856; Walling vs. Morefield, 33 An. 1174; C. C. 503, 3478-89, 3451.

A person in bad faith owes rents and revenues from the date of his occupancy. 33 An. 744, Sec. 4, Woods vs. Nicholls.

The prescription of three, five and ten years can not be made by a person in bad faith or *causa acquirendi*. 33 An. 1174; C. C. 3478, and C. C. caption Sec. 3, including Sec. 3, Art. 3542, show that the plea applies to *liberandi causa*.

·The admissibility of evidence given of facts not alleged in the petition should be objected to when offered and the point reserved, otherwise it will be considered as if it had been responsive to an allegation in an amended petition filed with the consent of the opposite party. England vs. Grippon, 15 An. 304.

It is not necessary to file an amended petition in reply to, and explanatory of, an amended answer, as the testimony in support of its averments is admissible under the issue presented by the amended answer. Swilling vs. Law, 13 An

Vanosdel vs. Hyce.

412.  All matters of defence set up in the answer must be considered as open to-
any objection of law and fact, as if such objections had been specially pleaded.
Hickman vs. Dawson, 33 An. 438.

*Kernan & Laycock* and *J. W. & G. W. Burgess* Attorneys for De-
fendant and Appellee:

To annul a contract, for the insanity of a party to it, who has not been previously
interdicted, it must be shown not only that the incapacity existed at the time
the contract was made, but also that the person contracting with him knew of
the incapacity, or that his insanity was notorious.  R. C. C. 402; 1788, Secs. 2
and 3; 5 M. 425; 10 M. 604; 12 M. 255; 4 L. 114; 12 An. 24; 38 An. 546.
Notoriety in this sense can only be shown by the testimony of those who generally
saw and conversed with the person incapacitated.
Insanity, urged as the cause for invalidating a contract, must be clearly proved;
doubts are resolved in favor of the sanity of the person contracting.  12 M. 255.
Where the consideration of a sale enured to the benefit of the interdict, it can not
be annulled on the ground of the insanity of the vendor without restitution of
the purchase price; and, in any case, the vendee must, on proper pleading and
proof, have judgment for his improvements up to the sum by which they have
enhanced the value of the property.
A suit brought to annul a sale more than fourteen years after its execution is a
stale demand, which must be established by the clearest and most convincing
proof.

The opinion of the court was delivered by

BREAUX, J.  In 1893 suit was brought against Enoch Vanosdel and
his interdiction decreed.

The plaintiff was appointed his curator.

This suit was brought by the curator to annul and set aside a deed
of sale, dated the 22d day of January, 1879, signed by Enoch Van-
osdel, as vendor of a tract of land containing 160 acres, to the de-
fendant.  The vendor reserved the right to purchase back the
property, until the 1st of January, 1880, by returning to the pur-
chaser the amount paid by him on the property, and returning the
promissory note representing a portion of the purchase price.  He
remained in possession after the sale, which was intended as a
security for advances to be made by the vendee.  On the 21st day
of November, 1879, Enoch Vanosdel acknowledged in a notarial
deed, signed also by his wife, that he had received the full amount
of the purchase price, and renounced the right of redemption
stipulated in the deed of 22d January, 1879.

This land was acquired by Enoch Vanosdel from G. W. Martin in
an exchange, dated 12th January, 1879.

Two of the deeds were passed before John McGrath, recorder of the parish of East Baton Rouge.

From the 1st of June until the latter part of October Enoch was afflicted with mental alienation, and was a patient during that time at the Insane Asylum at Jackson, undergoing medical treatment.

The purchaser, prior to the signing of the confirming deed of November, 1879, paid $100 to Enoch and $100 to his wife, making $2300, according to Hyce's account. The act of sale was for $1500.

The witnesses testify that it was about all that the place was worth.

With reference to his mental condition, G. A. Bozeman, a farmer residing near this vendor, Enoch, in 1879, and who subsequently was employed in the sheriff and assessor's office, and had opportunities to judge as to whether he was insane, testifies that he knew him intimately, and regarded him as a man of sound mind in the early part of 1879.

The sheriff of the parish and a number of other witnesses testify that they knew him, and never noticed that he was deranged prior to the date he was sent to the Insane Asylum; that after leaving the asylum in 1879 he appeared sane; that he voted intelligently, and sought to support himself and family, consisting of wife and children.

The notary before whom the acts were passed testifies that there was nothing in the conduct of the vendor, when he passed these acts of sale, to indicate that he was in the least deranged.

Dr. T. S. Jones testifies that he has known Enoch Vanosdel over forty years, that he was a stupid boy, but that he can not state that he was an imbecile.

Other witnesses testify that he was always weak-minded, and refer to certain of his acts as showing insanity.

The testimony, however, does not sustain the contention of the plaintiff that at the time of these transactions Enoch was incapable of transacting business or of making contracts for the want of sufficient intelligence and sense to manage his affairs, and that in his weak mental condition he fell an easy prey to the wiles and machinations of the defendant Hyce.

More than twenty witnesses, who knew him well, resided in the same parish; many of them his neighbors, who met him frequently, conversed with him and knew of his different business transactions, testify that they did not know of any of his acts indicating insanity,

and that they had never heard that he was insane at the time that the deeds were passed.

The transactions at the time were not referred to or spoken of in the community by any one, in so far as the evidence discloses, as the acts of imposition and fraud by an unscrupulous neighbor, the defendant merchant.

The brother who became the interdict's curator and the plaintiff in this suit, in that capacity, had a business transaction about the same time with the defendant. He also obtained advances from the defendant and deeded to him the same number of acres of land,. worth about the same amount, to secure the advances.

It does not appear that the terms and conditions differed materially from those complained of in this suit.

Not long subsequent to that date the plaintiff himself had business dealings with his brother.

While unimportant in amount they do not have a tendency to establish that he was known as a person of insane mind.

One of the witnesses testified that she had told the defendant that Enoch was a "man of very little sense," that "he was idiotic," and that he had never transacted any business.

She is the only witness who testified as to any notice to the defendant. She is not corroborated by the weight of the testimony, particularly in so far as relates to business transactions, for it is well established that he did transact business.

The defendant denies that he was ever notified or received any warning not to deal with him.

More than fourteen years had elapsed; the transactions remained unquestioned all these years, without even adverse comments; we do not feel authorized to disturb these executed contracts.

In reference to the advances made by the defendant on the property placed in his name as security:

A receipt in notarial form was executed after they had been furnished.

The mules that were part of the property thus advanced are said by several witnesses not to have been worth the amount charged.

The record discloses that they were not sold directly by the defendant, as appears from the following:

" W. H. Wright, sworn, says:

Q. "Did you let Mr. Enoch Vanosdel have some mules during the

first part of the year '79? If so, please state how many, at what.
price and who paid you for them? A. I sold some mules to Mr.
Vanosdel in the early part of '79. I sold him, I think, four mules;
I ain't sure. Mr. Vanosdel, as I recollect, came here to Baton-
Rouge. He wanted to buy some mules and he looked at the stock;
he told me he would buy them and he would make arrangements.
with Mr. Hyce to pay for them. I went up to Mr. Hyce's place and
he, Mr. Vanosdel, was at Rolling Fork, and he, Mr. Hyce, was not
present at the time. I left the mules and horses there. I sold them
to him, but I can not tell you the price of them; I have forgotten—I
can not tell the price.

Q. "Mr. Hyce paid you for them? A. Yes, sir; I think it was.
about two weeks afterward he paid me.

Q. "Was it a fair price that you charged Vanosdel? A. I had a
talk with Mr. Hyce and he told me any kind of a deal that I made-
with this man would be all right. He told me that he did not want
to make any money on it himself. He said: 'If you sell any stock-
to my tenants, I don't want to make any money on it.'

Q. "You made the trade with Enoch Vanosdel? A. He bargained
with me for the stock. I left them there and Mr. Hyce paid me for
them afterward.

Q. "In dealing with Enoch Vanosdel did he strike you as a man
who would be able to take care of his side of a trade. A. I did not,
see anything wrong with him any more than any other man."

Relative to the remainder of the account the testimony does not.
show an advantage improperly taken.

The witnesses for plaintiff state that advances were made of such
provisions as he and his laborers needed.

There were also certain debts paid. The mere impression of cer-
tain witnesses that there were overcharges would not justify the-
conclusion that the amount advanced did not amount to, at least,
$1500, the price and value of the property in controversy.

In Chevalier vs. Whately and Husband, 12 An. 561, a well consid-
ered case, the court held that contracts with weak-minded persons
will be closely scrutinized and those who deal with them held to a.
strict standard of good faith.

The facts of that case make manifest the correctness of the con-
clusion regarding them.

The object of the suit was to annul two acts of sale executed, one
on the 28th December, 1847, the other on the 26th February, 1848.

The vendor died in 1853 and the suits were brought immediately after his death.

The professed consideration of one of the sales was not paid at all.

The consideration seemingly of the other sale consisted of property which continued as before, and as they always intended it should continue, to belong to the vendor.

The vendor was an excessively weak-minded person, most easily duped and deceived.

The defendants were his relatives and he was living with them. Their influence as relations and protectors over one of his mental incapacity was obvious.

The court concluded that advantage had been improperly taken of the weak-minded vendor by his relatives, the vendees.

In the case at bar, the time which elapsed between the date of sale and that of suit is much greater.

The sale was not without consideration, and it was not notorious that the vendor was weak-minded, nor is the fraud charged obvious.

In case of Holland vs. Miller, 12 An. 624, the fraud was not established. The court says: "Contracts would rest on a very weak foundation, if those of the most solemn character could be avoided on allegations of insanity, when the proof thereof is contradictory.

"It would be necessary for the contracting parties, before the execution of the contract, to inquire into their mutual mental soundness."

These utterances apply to the case at bar.

In Baumgarden, Curatrix, vs. Langles, 35 An. 441: On the 31st December, 1877, Baumgarden sold to Langles.

Suit to annul the sale was brought on the 30th December, 1878.

One of the grounds was fraud, in that defendant being well aware of Baumgarden's mental weakness, took advantage thereof and that by threats, improper influences and false and fraudulent representations induced the vendor to sign the deed of sale.

The proof was not clearly established.

The court affirmed the judgment of the District Court rejecting the demand.

The law treats with special regard those unfortunate beings deprived of understanding by some providential dispensation.

It also treats with tenderness those whose mental weakness renders incapable of managing their affairs; but neither applies in the case

at bar, for the evidence does not establish that the sadly afflicted man who was interdicted in 1893 was insane in January, 1879, nor does it establish that he was at the last mentioned date notoriously weak-minded and incapable of giving consent to a contract for advances to enable him to cultivate his place.

The judgment appealed from is affirmed at appellants' costs.